**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEVIN SYPOLT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 19-cv-05991 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THE ILLINOIS GAMING BOARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kevin Sypolt was the principal of multiple corporate entities that owned establishments in Illinois featuring video gaming devices for gambling. After one of the companies managed by Sypolt sued the Illinois Gaming Board ("IGB" or "Board"), the state agency tasked with regulating video gaming, the IGB allegedly launched a campaign of retaliation against Sypolt and two of his businesses, Plaintiffs Phase IV-D, Inc. ("Phase IV-D") and Trudy's Café, LLC ("Trudy's Café"). In particular, Plaintiffs claim that the IGB unreasonably delayed its consideration of video gaming establishment license ("Establishment License") applications submitted by Phase IV-D and Trudy's Café, before ultimately denying the applications. Plaintiffs contend that those delays and denials caused them to lose video gaming revenue and ultimately forced them to close their establishments. Their Amended Complaint asserts two claims under 42 U.S.C. § 1983 alleging that IGB agents Defendants Thomas Hobgood,[1] Fidel Aguilar, and Mark Ostrowski conspired to deprive Plaintiffs of their

[1] During the pendency of this case, Defendant Hobgood passed away and Louis G. Apostol, Public Administrator of Cook County, as Administrator of the Estate of Thomas Hobgood, was substituted as Defendant in his place. (Dkt. No. 174.)

constitutional rights. Defendants have filed a motion for summary judgment. (Dkt. No. 274.) For the reasons that follow, Defendants' motion is granted.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

Kevin Sypolt, the majority shareholder and principal of Phase IV-D and Trudy's Café, applied to the IGB on behalf of those entities for Establishment Licenses, which would allow them to operate video gaming terminals at three different establishments in Illinois. (Pls.' Resp. to Defs' Statement of Facts ("PRDSF") ¶¶ 33, 48–49, Dkt. No. 282-1; *see also* Defs.' Mot. for Summ. J., Ex. 22, Dkt. No. 275-23.) "There is no common-law right in Illinois to engage in or profit from gambling." *J&J Ventures Gaming, LLC v. Wild, Inc.*, 67 N.E.3d 243, 251 (Ill. 2016). However, Illinois's Video Gaming Act ("Act"), 230 ILCS 40/1 *et seq.*, "legalized the use of video gaming terminals as a new form of commercial gambling within certain licensed establishments." *Id.* at 245. The Act defines a "video gaming terminal" as follows:

> any electronic video game machine that, upon insertion of cash, electronic cards or vouchers, or any combination thereof, is available to play or simulate the play of a video game, including but not limited to video poker, line up, and blackjack, as authorized by the Board utilizing a video display and microprocessors in which the player may receive free games or credits that can be redeemed for cash. The term does not include a machine that directly dispenses coins, cash, or tokens or is for amusement purposes only.

230 ILCS 40/5. Under the Act, video gaming terminals may be operated only at licensed establishments and by licensed terminal operators. 230 ILCS 40/25(c), (e).

"The Act explicitly vests the [IGB] with authority to administer the Act by granting the Board 'all powers necessary and proper to fully and effectively execute [its] provisions' and by directing that the Board 'shall have jurisdiction over and shall supervise all gaming operations governed by [the] Act.'" *J&J Ventures*, 67 N.E.3d at 251–52 (quoting 230 ILCS 40/78(a)). Accordingly, the IGB is tasked with "investigat[ing] and determine[ing] the eligibility of

applicants for licenses and . . . select[ing] from among competing applicants those applicants who best serve the interests of the citizens of Illinois." *Id.* at 252 (citing 230 ILCS 40/78(a)(1)). Pursuant to its authority under the Act, the IGB "has adopted regulations establishing certain qualifications and requirements of licensees in order to 'preserve the integrity and security of videogaming' in Illinois [and] also has adopted regulations governing the license-application process and the procedure for requesting a hearing upon denial of a license application." *Id.* (quoting 230 ILCS 40/45(e)).

Before applying for Establishment Licenses for Phase IV-D and Trudy's Café, Sypolt was involved with Windy City Promotions, LLC ("WCP"), a company that distributed sweepstakes machines (also referred to as coupon kiosks or product promotion kiosks) to businesses across Illinois. (PRDSF ¶¶ 1–8.) Whether those sweepstakes machines constitute illegal gambling devices under Illinois law was and continues to be the subject of considerable debate. (PRDSF ¶ 9; Defs.' Resp. to Pls.' Statement of Additional Facts ("DRPSAF") ¶¶ 1–2, Dkt. No. 291.) Illinois's prohibition on gambling excludes both licensed video gaming terminals as well as "[g]ames of skill or chance where money or other things of value can be won but no payment or purchase is required to participate." 720 ILCS 5/28-1(b)(12)–(13). In WCP's view, its sweepstakes machines were not illegal gambling devices because a customer who inserts money into the machine receives something of value in exchange, a coupon, and is then entered into a free sweepstakes incidental to that purchase. (Pls.' Opp'n, Ex. 2, Dkt. No. 282-5.) Further, the machines also include an option for customers to enter the sweepstakes for free. (*Id.*) On the other hand, others regard the sweepstakes machines as "attempting to squeeze through a perceived legal loophole . . . based on the dubious contention that the consideration paid for

generally unused products from these machines is not the gambling element of consideration to gamble on the devices." (PRDSF ¶ 12.[2])

The IGB took the position that sweepstakes machines are illegal. In the Board's view, the sweepstakes machines are an end-run around the Act's licensure requirements for video gaming and its regulations related to the "background and integrity of owners & operators," "the fairness of the games and the percentages of payouts," "the exclusion of customers too young to go to licensed gambling venues," compliance with "zoning standards," and the provision of "information about counseling and treatment options to control gambling." (*Id.* ¶ 16.) Thus, on December 5, 2013, it provided the following notice on its website:

> It is the opinion of the IGB that [sweepstakes machines] fit the definition of a gambling device. These devices will not be licensed by the IGB. An owner of a Licensed Video Gaming Location found to be in possession of such a Device could be charged with a felony under the [Act].

(*Id.* ¶ 10.) That notice further warned that "at a minimum, possession of [a sweepstakes machine] will jeopardize suitability for initial or continued licensure." (*Id.* ¶ 11.)

Despite the IGB's position on the legality of sweepstakes machines, Sypolt continued to distribute sweepstakes machines through WCP. (*Id.* ¶ 25.) In 2014, WCP installed sweepstakes machines at a gym owned by Sypolt's brother in Grundy County, Illinois. (*Id.* ¶ 26.) Shortly thereafter, agents of the Board seized those machines, which led WCP to sue the IGB for their return ("WCP Litigation"). (*Id.* ¶ 27.) WCP's complaint in the WCP Litigation requested both the return of the sweepstakes machines and a declaratory judgment that the sweepstakes

[2] Plaintiffs object to Defendants' statements of fact regarding the legal debate over sweepstakes machines because the cited periodical and newspaper articles are inadmissible hearsay. But the periodical and newspaper articles are admissible non-hearsay because they are offered simply to provide background over the legal debate regarding the legality of sweepstakes machines. *See, e.g.*, *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998) ("Offering testimony to establish background facts leading up to a sequence events is . . . an ostensibly non-hearsay use of evidence.").

machines were not illegal gambling devices. (PRDSF ¶ 27; *Windy City Promotions, LLC v. Ill. Gaming Bd.*, 87 N.E.3d 915, 917 (Ill. App. Ct. 2017).) On March 13, 2015, the trial court ruled in the IGB's favor insofar as it found that the Board had the authority to issue its website notice on the legality of the sweepstakes machines but ruled in favor of WCP in finding that the Board lacked the authority to seize the sweepstakes machines. (PRDSF ¶ 28.)

Both of the trial court's rulings were appealed. (PRDSF ¶ 29; *Windy City Promotions*, 87 N.E. 3d at 916–17.) While the appeal was pending, WCP opted to drop its appeal. (*Windy City Promotions*, 87 N.E.3d at 919.) But the IGB carried on with its appeal of the trial court's ruling that it lacked the authority to seize the sweepstakes machines, and an intervening party continued to litigate the appeal against WCP. (*Id.*) On July 19, 2017, the Illinois Appellate Court issued its decision. Given WCP's absence from the appeal, its claim regarding the legality of the sweepstakes machines was not before the Illinois Appellate Court and was not addressed by it. (PRDSF ¶ 32; *Windy City Promotions*, 87 N.E.3d at 919 ("[W]e emphasize that the legality of the [sweepstakes machines] is not at issue in this appeal.").) Instead, the two issues presented by the appeal were whether the Board had the authority to issue the website notice regarding the legality of the sweepstakes machines and whether it had the authority to seize those machines.[3] (*Windy City Promotions*, 87 N.E.3d at 919.) With respect to the first question, the Illinois Appellate Court ruled that the IGB's website notice was invalid because the Board failed to follow the proper rulemaking procedures. (PRDSF ¶ 30; *Windy City Promotions*, 87 N.E.3d at 922–23.) It therefore held that while the Board "had authority to issue an interpretive rule and to

[3] By the time of the Illinois Appellate Court's decision, the IGB had returned the seized sweepstakes machines to WCP. Notwithstanding the return of the sweepstakes machines and that the legality of the sweepstakes machines was no longer in issue, the Illinois Appellate Court declined to find the appeal moot under the "capable of repetition yet evading review exception." (*Windy City Promotions*, 87 N.E.3d at 920–21.)

post it . . . because it failed to follow the appropriate rulemaking procedures, the attempted rule [was] invalid." (*Windy City Promotions*, 87 N.E.3d at 923.) As to the second question, the Illinois Appellate Court determined that the IGB's seizure of the sweepstakes machines "was a valid exercise of administrative authority." (PRDSF ¶ 31; *Windy City Promotions*, 87 N.E.3d at 925.)

Shortly after the trial court's ruling in the WCP Litigation, the IGB notified Sypolt's wife, Renee Fanjon, that it was denying the Establishment License application she had submitted on behalf of her video gaming business, Mexican Woman Gaming, LLC. (DRPSAF ¶ 12.) That notice explicitly cited Fanjon's marriage and business relationship with Sypolt as a basis for its denial. (*Id.*) In particular, the notice took issue with the fact that Sypolt used WCP to provide sweepstakes machines "which the Board has determined are illegal gambling devices." (*Id.*) The notice was signed by Mark Ostrowski, in his capacity as IGB Administrator, and IGB agents Fidel Aguilar and Thomas Hobgood were involved in the underlying investigation. (*Id.* ¶¶ 12–13.)

While the WCP Litigation was on appeal, Phase IV-D applied to the Board for an Establishment License on December 8, 2016. (PRDSF ¶ 33.) In its application, Phase IV-D disclosed that Sypolt was a 70% shareholder in the company and Fanjon held the remaining shares. (*Id.* ¶¶ 33–34.) However, because Phase IV-D's original application failed to disclose that Fanjon had four previous Establishment License applications denied by the IGB, Phase IV-D amended its application on February 9, 2017, to include that disclosure. (*Id.* ¶¶ 34–35.) Yet the amended application omitted the same information about Fanjon's denials in another section of the application requiring such disclosure. (*Id.* ¶ 35.) At a May 2017 Board meeting, the IGB voted to deny Phase IV-D's application and it issued its notice of denial on June 2, 2017. (*Id.*

¶ 36.) The notice of denial explained that Phase IV-D's Establishment License application was being denied based on its submission of false information regarding Fanjon's four previous Establishment License denials and Sypolt's prior conviction for a crime involving dishonesty. (*Id.* ¶ 38.) It went on to state that, in the Board's discretion to "refuse to license any person for just cause," the IGB had determined that neither the interests of Illinois's citizens nor the integrity of the videogaming industry would be served by licensing an applicant that had not provided truthful information in its application and had an owner with a prior conviction for a crime involving dishonesty. (*Id.*)

After receiving the Board's notice of denial, Sypolt and Phase IV-D requested and were granted a hearing before an Administrative Law Judge ("ALJ"). (*Id.* ¶¶ 39–40.) Prior to the hearing, the parties had settled the issue regarding Sypolt's prior conviction for a crime involving dishonesty, and therefore the sole issue before the ALJ was whether the IGB properly denied Phase IV-D's application for failure to provide truthful information. (*Id.* ¶ 42.) In a written opinion dated January 31, 2018, the ALJ concluded that the IGB could properly find an applicant ineligible for failing to provide truthful information even unintentionally but nonetheless recommended that the IGB exercise its discretion to issue Phase IV-D an Establishment License. (PRDSF ¶¶ 43–45; Defs.' Mot. for Summ. J., Ex. 21, Dkt. No. 275-22.) The Board adopted the ALJ's recommendation and issued Phase IV-D an Establishment License. (PRDSF ¶ 46.)

On September 26, 2018, and November 29, 2018, Sypolt submitted two more Establishment License applications on behalf of Trudy's Café. (*Id.* ¶¶ 48–49.) At some point prior, Ostrowski left the IGB and was therefore not involved in its consideration of Trudy's Café's applications. (*Id.* ¶ 50.) Aguilar and Hobgood interviewed Sypolt on February 22, 2019,

in connection with their site inspection for one of the applications. (*Id.* ¶ 52.) During that interview, Sypolt told the investigators that WCP had installed its sweepstakes machines at approximately sixty locations but he claimed that he was no longer interested in being involved with sweepstakes machines. (*Id.* ¶¶ 53–54.) While Aguilar and Hobgood asked Sypolt to provide them with a list of locations where sweepstakes machines were installed, Sypolt declined to do so on the advice of counsel. (*Id.* ¶ 55.)

Trudy's Café's License Establishment applications were scheduled to be considered at the August 2019 Board meeting. (*Id.* ¶ 57.) In advance of that meeting, several IGB agents had recommended that the Board approve both applications. (*Id.*) However, Sypolt claims that Hobgood had told him during the investigation that the IGB would deny Trudy's Café's applications. (PRDSF ¶ 57; Pls.' Opp'n, Ex. 35, Sypolt Aff. ¶¶ 5–6, Dkt. No. 282-38.) And shortly before the August 2019 meeting, Robert Burke, an IGB investigator, sent an email to the IGB's general counsel highlighting the ways in which he believed that Sypolt had failed to cooperate with IGB investigations in the past. (PRDSF ¶ 58; DRPSAF ¶ 31.) Around the same time, Sypolt's attorney sent the Board multiple emails in which she erroneously advised that Sypolt was no longer involved with WCP or any other provider of sweepstakes machines and that WCP no longer had any sweepstakes machines in operation. (PRDSF ¶¶ 60–63; DRPSAF ¶¶ 26–30.) Those statements conflicted with Sypolt's own representations to IGB investigators about his ongoing involvement with WCP and sweepstakes machines. (DRPSAF ¶ 25.)

On August 2, 2019, the IGB informed Sypolt's counsel that it had removed Trudy's Café's Establishment License applications from the August 2019 meeting agenda due to Sypolt's failure to confirm whether WCP was continuing to sell sweepstakes machines in Illinois. (PRDSF ¶ 64.) In response, Sypolt's counsel again inaccurately stated that WCP was no longer

involved with sweepstakes machines. (*Id.* ¶ 65.) And, in an August 5, 2019 letter, his counsel incorrectly advised that Sypolt was no longer an owner of or otherwise involved with WCP. (*Id.* ¶ 66.) On September 11, 2019, Sypolt requested that Trudy's Café be permitted to withdraw its two Establishment License applications. (*Id.* ¶ 68.) However, Ostrowski's successor as Board Administrator, Marcus Fruchter, objected to the request. (*Id.*)

At its November 17, 2019 meeting, the IGB voted to deny Trudy's Café leave to withdraw its two applications. (PRDSF ¶ 71; DRPSAF ¶ 35.) By rejecting Trudy's Café's withdrawal request and then proceeding to vote to deny its applications on the merits, the IGB effectively precluded Sypolt from obtaining an Establishment License in the future. (PRDSF ¶ 71; DRPSAF ¶¶ 35–36.) As grounds for its denials, the IGB cited the conflicting and misleading information provided regarding Sypolt's ongoing involvement with WCP. (*Id.*) Trudy's Café subsequently requested an administrative hearing on the denials. (*Id.* ¶ 73.) Sypolt's counsel also submitted an affidavit to the IGB in which she took full responsibility for providing the Board with misleading information and stated that she communicated those misstatements without Sypolt's knowledge or authorization. (DRPSAF ¶¶ 26–28.) The IGB took no action in response to that affidavit. (*Id.* ¶ 28.) While Trudy's Café's administrative challenge was pending, the two establishments for which it sought licensure surrendered their liquor licenses. (PRDSF ¶ 74.) And without liquor licenses, those establishments were ineligible for Establishment Licenses. (*Id.* ¶¶ 74–75.) The ALJ therefore recommended denying Trudy's Café's applications on that basis, and the IGB adopted the ALJ's recommendation on April 21, 2021. (*Id.* ¶¶ 75–76.) Sypolt has since closed several of his videogaming businesses and moved out of Illinois. (DRPSAF ¶ 40.)

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Plaintiffs' Amended Complaint asserts two § 1983 conspiracy claims §alleging that Ostrowski, Hobgood, and Aguilar conspired to deprive Plaintiffs of their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. Specifically, Plaintiffs allege that Defendants were upset that Sypolt challenged the IGB's authority in the WCP Litigation and therefore entered into an agreement to retaliate against him by ensuring that the IGB treated his businesses' Establishment License applications unfavorably. Defendants contend that they are entitled to summary judgment as to both of Plaintiffs' § 1983 conspiracy claims.

At bottom, this case is just one front in Sypolt's larger clash with the IGB over the legality of sweepstakes machines. Thus, before addressing Plaintiffs' individual constitutional claims, the Court will first set out the contours of that conflict, as established by the undisputed facts. With that backdrop in mind, the Court will then turn to consider Plaintiffs' specific claims.

### I. Sweepstakes Machines

There is no real dispute among the parties that Sypolt's involvement with sweepstakes machines caused many within the IGB to deem him and his affiliated businesses as unsuitable for licensure. In the IGB's view, the sweepstakes machines were an illicit attempt at exploiting a perceived legal loophole to circumvent the regulatory regime that Illinois has prescribed for video gaming. (*See* PRDSF ¶ 16.) The Board communicated its position to the public in its

December 2013 website notice and further warned that it would not be inclined to grant or renew licenses to those involved with sweepstakes machines. (*Id.* ¶¶ 10–11.)

It is hardly surprising, then, that the undisputed facts show that Sypolt's involvement with WCP and the sweepstakes machines factored heavily into the Board's consideration of the Establishment License applications submitted by his businesses. Even before Sypolt's application on behalf of Phase IV-D, Sypolt's involvement in the sweepstakes machines was explicitly cited as the IGB's basis for denying license applications submitted by his wife, Fanjon. As it explained in its denial letter to Fanjon, the IGB found that her personal and business relationships with a provider of "illegal gambling devices" supplied just cause to deny her application. (Pls.' Opp'n, Ex. 7, Dkt. No. 282-10.) And one IGB agent involved in the consideration of Fanjon's application opined that Sypolt was "peddling illegal gambling devices." (DRPSAF ¶ 16; Pl.'s Opp'n, Ex. 8, Dkt. No. 282-11.)

Later, when Trudy's Café submitted its applications, Aguilar sent an email noting that those applications raised a red flag because Sypolt "is one of the owners of [WCP] (the plaintiff in the Grundy county case)." (DRPSAF ¶ 22.) And a major focus of Hobgood and Aguilar's investigation of those applications was Sypolt's involvement with WCP. (*Id.*) In emails discussing Trudy's Café's applications, one IGB agent recommended denying the applications because Sypolt "is a supplier of illegal sweepstakes machines," and another agent asserted that he was "100% against licensing [Sypolt] at all in the first case just because of his participation in sweepstakes with [WCP]." (Pls.' Opp'n, Ex. 18, Dkt. No. 282-21.) In another email chain discussing Sypolt's request to withdraw Trudy's Café's applications, an IGB agent recalled that those applications were set to be considered at the next Board meeting with a recommendation to

deny them because of Sypolt's "continued involvement in a sweepstakes company." (Pls.' Opp'n, Ex. 13, Dkt. No. 282-16.)

When viewing these facts in the light most favorable to Plaintiffs as the non-moving parties, there is little doubt that the IGB was acting consistent with the notice on its website warning that anybody involved with sweepstakes machines risked their eligibility for future licensure. Thus, IGB staff regarded Sypolt's involvement with the sweepstakes machine as a reason not to grant Establishment Licenses to his businesses. For his part, Sypolt relied on the advice of counsel that the sweepstakes machines were legal before getting into that business. (DRPSAF ¶ 2.) Rather than stand down in the face of the IGB's notice of its position that those machines were illegal, Sypolt, through WCP, continued distributing sweepstakes machines. With both regulator and regulated holding firm on their opposing positions regarding the legality of the sweepstakes machines, litigation inevitably followed. However, the WCP Litigation was resolved on technical grounds and provided no resolution as to the matter of the sweepstakes machines' legality.

While Sypolt emphasizes that the IGB has not promulgated a rule outlawing the sweepstakes machine in the aftermath of the Illinois Appellate Court's invalidation of the website notice's attempted rulemaking (*id.* ¶ 10), it is also true that no court has ruled that either Sypolt's or WCP's involvement with sweepstakes machines did not violate Illinois law. To date, there has not been any precedential state court decision addressing the legality of sweepstakes machines. Instead, Sypolt can point to two Illinois trial courts (in cases not involving Sypolt or his businesses) that have found sweepstakes machines to be legal. (PRDSF ¶ 9; DRPSAF ¶ 3.) On the other hand, the IGB has on its side an unpublished (and thus non-precedential) decision in which the Illinois Appellate Court held that sweepstakes machines "fall squarely into the

definition of a video gaming terminal as defined by the Act" and was "unpersuaded by [the] contention that possessing the [sweepstakes machines] are an exception to gambling under" Illinois law simply because "they have a 'free play' mode." *Clair v. Village of Hanover Park*, 2021 IL App (1st) 190515-U ¶¶ 27–28. Accordingly, the legality of sweepstakes machines under Illinois law remains an open question.

Based on the undisputed facts, the core conflict underlying this action can be succinctly summarized as follows. Sypolt was a provider of sweepstakes machines that the IGB, the regulator of the Illinois video gaming industry, regarded as illegal gambling devices. When the IGB tried to enforce its position against Sypolt, the ensuing WCP Litigation yielded no clear winner. Nor have subsequent events resolved the parties' dispute over the status of sweepstakes machines under Illinois law. In the meantime, Sypolt sought licenses for legal video gaming from the same regulator that believed he was facilitating illegal video gaming. Various agents made no secret that they held Sypolt's association with illegal sweepstakes machines as a reason for denying Plaintiffs' Establishment License applications. And the IGB maintains before this Court that its "official position . . . is that sweepstakes machines are illegal under the [Act] and the Illinois Criminal Code." (Defs.' Reply at 4, Dkt. No. 290.) Thus, the Court's analysis below can set aside the IGB's official explanations of its actions with respect to Plaintiffs' Establishment License applications and accept that the Board brought its position on sweepstakes machines to bear in its consideration of Plaintiffs' Establishment License applications. The relevant question for this Court is whether the particular Defendant IGB agents here violated Plaintiffs' constitutional rights in doing so.

## II. Section 1983 Conspiracy

To establish a § 1983 conspiracy claim, a plaintiff must prove that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance

actually deprived him of those rights." *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (internal quotation marks omitted). Moreover, because "conspiracy is not an independent basis for liability," a plaintiff must "show an underlying constitutional violation and demonstrate that the defendants agreed to cause the constitutional harm." *Fulton v. Bartik*, Nos. 20 C 3118, 20 C 3119, 2021 WL 2712060, at *11 (N.D. Ill. July 1, 2021). Thus, the Court begins by considering whether there is a genuine dispute of fact as to whether Defendants violated Plaintiffs' constitutional rights and, if so, whether Defendants agreed to cause that harm. Here, Plaintiffs allege that Defendants conspired to unreasonably delay and deny their Establishment License applications, all in violation of Plaintiffs' rights to equal protection of the laws and their First Amendment rights. The Court addresses each alleged constitutional violation in turn.

### A. Equal Protection

Plaintiffs assert a class-of-one equal protection claim. Although equal protection claims usually address "governmental classifications that affect some groups of citizens differently than others," a plaintiff does not necessarily need to allege class-based discrimination to maintain such a claim. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (internal quotation marks omitted). Rather, a plaintiff may bring a valid equal protection claim as a "class of one" by alleging that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). However, the Seventh Circuit has advised courts to guard against "turning every squabble over municipal services, of which there must be tens or even hundreds of thousands every year, into a federal constitutional case." *Brunson v. Murray*, 843 F.3d 698, 708 (7th Cir. 2016) (internal quotation marks omitted). Consequently, "[c]lass-of-one claimants carry a heavy burden." *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 588 (7th Cir. 2021).

"The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive[,] comes down hard on a hapless private citizen." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (internal quotation marks omitted). It remains an open question in the Seventh Circuit whether a class-of-one plaintiff must prove personal animus or improper motive as an element of the claim. The Seventh Circuit, sitting *en banc*, split three ways on the question in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc), with no position obtaining a majority. The plurality expressed that a plaintiff "should be required to plead and prove that the disparate treatment was motivated by personal ill will or other illegitimate purpose; that is, a purpose unrelated to public duty." *D.B. ex. rel Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013) (citing *Del Marcelle*, 680 F.3d at 888–900 (Posner, J.) (plurality opinion)). The dissent took the position that "personal animus or other improper motive is not an element of the claim but just one way to prove that the defendant's action lacked a rational basis." *Id.* (citing *Del Marcelle*, 680 F.3d at 905–18 (Wood, J., dissenting)). And one concurring judge "concluded that motive or intent 'has no role at all' in class-of-one litigation." *Id.* (quoting *Del Marcelle*, 680 F.3d at 900 (Easterbrook, C.J., concurring in the judgment)). Nonetheless, under any articulation of the standard, if the Court "can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no." *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014). "The rational-basis requirement sets the legal bar low and simply requires a rational relationship between the disparity of treatment and some legitimate governmental purpose." *D.B.*, 725 F.3d at 686 (internal quotation marks omitted).

Here, the Court finds that Defendants rationally treated Plaintiffs' Establishment License applications unfavorably based on Sypolt's involvement with sweepstakes machines. As agents

of the agency responsible for overseeing video gaming in Illinois, it was entirely reasonable for Defendants to be reluctant to grant licenses to businesses affiliated with Sypolt, someone who was actively distributing machines that the IGB had publicly asserted were illegal gambling devices. Indeed, under the Act, the IGB cannot grant a license to an individual that it finds to "have a background, including . . . prior activities that pose a threat to the public interests of the State or to the security and integrity of video gaming." 230 ILCS 40/45(d)(1). Certainly, the IGB could reasonably conclude that Sypolt's involvement with sweepstakes machines presented a threat to the security and integrity of video gaming. The evidence shows that there is a substantial debate over the legality of sweepstakes machines, with some viewing the machines as "exploit[ing] . . . a loophole in Illinois's gambling laws" to circumvent local restrictions and regulations on video gaming or "allow people who likely would be rejected by the [IGB] for a video gambling license a way into the business." (PRDSF ¶¶ 13–14.)

Whether the IGB is correct that sweepstakes machines are illegal is not a matter that implicates equal protection. *See, e.g.*, *Battle v. Alderden*, No. 14 C 1785, 2017 WL 4150617, at *6 (N.D. Ill. Sept. 19, 2017) ("[A]n action does not amount to an Equal Protection violation even if based on a mistaken belief, so long as the action is rationally related to a legitimate government interest, and the belief is reasonable."). Nor is it for this Court to answer the state-law question in the first instance. For present purposes, it is enough that Defendants were acting consistent with the IGB's position that the sweepstakes machines are illegal, a question of Illinois law over which there remains a live debate. *See, e.g.*, *RJB Props., Inc. v. Bd. of Educ. of City of Chi.*, 468 F.3d 1005, 1011 (7th Cir. 2006) ("Regardless of whether [the plaintiff] actually engaged in wrongdoing, the [defendant's inspector general] suspected it of wrongdoing, and that is enough to justify the [defendant's] decision not to do business with them."); *Hilton v. City of*

*Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) ("[T]he plaintiff must present evidence that the defendant deliberately sought to deprive him of equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position."). The Illinois Appellate Court's conclusion in *Clair* that sweepstakes machines constitute video gaming terminals subject to the Act tends to show that the IGB's position was honestly held and reasonable. As such, Defendants had a conceivable rational basis for treating Plaintiffs unfavorably based on Sypolt's involvement with those machines.

That Sypolt's involvement in the sweepstakes machines was not the IGB's stated basis for denying Plaintiffs' Establishment License applications is also not this Court's concern. "[A]ny rational basis will suffice, even one that was not articulated at the time the disparate treatment occurred." *Srail v. Village of Lisle*, 588 F.3d 940, 946–47 (7th Cir. 2009). Once a conceivable rational basis "is identified, true or not, [the Court] may look no further." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 878 (7th Cir. 2025) (internal quotation marks omitted).

Nor does Plaintiffs' evidence of the Board granting video gaming licenses to others who had some involvement with sweepstakes machines suffice to defeat summary judgment. As an initial matter, "a defendant's enforcement of a law or ordinance against the plaintiff and not others 'is not typically a basis for a class-of-one challenge' unless the enforcement is 'based on some invidious discrimination.'" *Tranchita v. Callahan*, 511 F. Supp. 3d 850, 868 (N.D. Ill. 2021) (quoting *Van Dyke v. Village of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020)); *see also Stevo v. Frasor*, No. 07 C 6647, 2011 WL 253963, at *12 (N.D. Ill. Jan. 3, 2011) ("Simply to assert that the City enforced its Water Ordinance against one resident and not against others, without more, would not make out a Constitutional claim."). In any case, Plaintiffs fail to meet

their burden of identifying a similarly situated comparator who is "identical or directly comparable to the plaintiff in all material respects." *Wade v. Collier*, 783 F.3d 1081, 1088 (7th Cir. 2015) (internal quotation marks omitted). Plaintiffs claim that "[t]he IGB has granted licenses to individuals convicted of serious felonies, including illegal gambling and tax fraud, despite the fact that these crimes would be grounds to deny a licensing application." (DRPSAF ¶ 8.) "But an applicant cannot fashion a triable class-of-one claim merely because he can locate another applicant accused of arguably 'worse' conduct." *Fares Pawn*, 755 F.3d at 848.

The Court believes that the analysis here should focus on whether Plaintiffs were treated worse than other distributors of sweepstakes machines. To that point, Plaintiffs can only assert that "[o]ther sweepstakes operators . . . have been granted licenses by the IGB." (DRPSAF ¶ 4.) Plaintiffs' primary evidence in support of that factual assertion is Sypolt's own claim that the IGB "has licensed several Terminal Operators that distribute sweepstake kiosks. The IGB has also licensed establishments that also have sweepstake kiosks." (Pls.' Opp'n, Ex. 4, Dkt. No. 282-7.) Setting aside Plaintiffs' hearsay objections, that evidence is lacking in specifics—Sypolt does even specifically name one of those licensees. *Srail*, 588 F.3d at 946 ("[E]vidence of similarity requires specificity."). Further, to the extent that Sypolt could identify a licensee, if the licensee was an establishment that only purchased a sweepstakes machine, it would be distinguishable from a distributor like Sypolt. And if the licensee were a sweepstakes-machine distributor, to be an appropriate comparator, the distributor would need to be shown to sell those machines at scale at least roughly equal to Sypolt's operation—Sypolt claimed in February 2019 that WCP had installed sweepstakes machines at around sixty locations. Plaintiffs do not supply any such details.

In sum, the Court agrees with Plaintiffs that the evidence, viewed in their favor, shows that Defendants singled out Plaintiffs for unfavorable treatment on account of Sypolt's involvement with sweepstakes machines. The problem for Plaintiffs is that Sypolt's involvement with sweepstakes machines was itself a rational basis for Defendants' actions and directly related to Defendants' roles at the IGB. Defendants could have reasonably concluded that granting Establishment Licenses to Sypolt's businesses despite his involvement with questionably legal video gaming activities would be inconsistent with the Board's mandate to preserve the integrity and security of video gaming in Illinois. Consequently, Plaintiffs' class-of-one claim fails as a matter of law, and Defendants are entitled to summary judgment on Plaintiffs' claim that Defendants conspired to deny their equal protection rights.

**B. First Amendment Retaliation**

Next, Plaintiffs allege that Defendants conspired with each other to delay and deny Plaintiffs' Establishment License applications to retaliate against Sypolt for bringing the WCP Litigation, in violation of Plaintiffs' First Amendment rights. To prove a First Amendment retaliation claim, a plaintiff "must show: (1) he engaged in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity was a motivating factor in defendants' decision to retaliate." *Daugherty*, 906 F.3d at 610. There is no question that Sypolt was engaged in protected First Amendment activity when he, acting through one of the companies he managed, sued the IGB. *Novoselsky v. Brown*, 822 F.3d 342, 355 (7th Cir. 2016) ("The First Amendment right to petition the government extends to the courts in general and applies to litigation in particular." (internal quotation marks omitted)). Nonetheless, even assuming that Defendants' delays and denials of Plaintiffs' Establishment License applications were deprivations that would deter future protected activity, Plaintiffs fail to create a genuine dispute of fact as to whether those deprivations were caused by the WCP Litigation.

Ultimately, to prevail on a First Amendment retaliation claim, "a plaintiff must demonstrate that, but for his protected speech, the [defendant] would not have taken the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). But at summary judgment, "the burden of proof is split between the parties." *Id.* First, "a plaintiff must show that a violation of his First Amendment rights was a motivating factor of the harm he's complaining of." *Milliman v. County of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (internal quotation marks omitted). Once the plaintiff has made that threshold showing, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Id.* (internal quotation marks omitted). And if the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 431 (internal quotation marks omitted).

As to Plaintiffs' initial burden, they need only show that the WCP Litigation was a sufficient condition for Defendants' action—"something that, if it is present, something else is bound to happen"—as opposed to a necessary condition—"something that has to happen for something else to happen." *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011). That analysis is complicated by the circumstances here, where the protected activity, the WCP Litigation, is inextricably linked with the parties' larger dispute over the legality of sweepstakes machines. As discussed above, the IGB believed that sweepstakes machines were illegal gambling devices. Sypolt disagreed and continued selling sweepstakes machines in defiance of the IGB's stated position. That led the IGB to seize certain WCP sweepstakes machines and Sypolt to then challenge the seizure in the WCP Litigation. In short, the WCP Litigation was downstream of the IGB's effort at enforcing its position on the illegality of sweepstakes machines and, as such, was an exercise of the Board's regulatory authority over video gaming.

In considering a First Amendment retaliation claim in the context of a regulatory clash, the Seventh Circuit has advised that

> some tension between [the regulated] and regulators is to be expected, as are occasional adversarial proceedings. If the natural tensions that result from adversarial proceedings and regulatory enforcement actions sufficed to establish evidence of retaliatory motive, then the regulatory scheme could very well be undermined. State enforcement agencies have every right to vigorously enforce the law. [A plaintiff's] evidence must suggest something beyond the typical antagonism that arises between a regulator and a regulated (a relationship easily inflamed by difficult personalities).

*Woodruff v. Mason*, 542 F.3d 545, 552 (7th Cir. 2008) (internal quotation marks and citation omitted). Thus, to show that the WCP Litigation had a motivating role, Plaintiffs' evidence must show something more than Defendants' "zealous adversarial posture arising from the [Board's] regulatory mission." *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 153 (2d Cir. 2006). Put another way, Plaintiffs must demonstrate that the fact of the WCP Litigation itself had a motivating role independent of (even if alongside) the dispute regarding sweepstakes machines from which it arose. *See id.* at 154 (finding that the plaintiff demonstrated an issue of fact with evidence showing that the defendant regulators were "motivated by an intent to punish the [defendant] for exercising First Amendment rights of speech and petition rather than by—or distinctly in addition to—the antagonism that arises between a regulator and regulated").

The Court finds that Plaintiffs' evidence fails to plausibly show that the WCP Litigation was a motivating factor distinct from the broader fight over sweepstakes machines. While the WCP Litigation was sometimes brought up by various members of the IGB staff in their consideration of applications submitted by both Sypolt and his wife, Fanjon, the evidence shows that their belief in the illegality of the sweepstakes machines was their overriding concern. For example, Plaintiffs contend that Ostrowski spearheaded a plan to retaliate against Sypolt after the trial court's ruling in the WCP Litigation. (DRPSAF ¶ 11.) Yet Plaintiffs' evidence of those

discussions reveals that the trial court's ruling only came up because the ruling hindered the Board's ability to take enforcement action against machines associated with Sypolt. Thus, one IGB agent noted that the Board was "currently enjoined from doing anything related to [WCP] machines." (Pl.'s Opp'n, Ex. 6, Dkt. No. 282-9.) Still, another IGB agent maintained that "[t]he machines are contraband." (*Id.*)

Later, in discussions regarding applications submitted by Fanjon's businesses, IGB staff acknowledged that the WCP Litigation was delaying the Board's consideration because it was "trying to get a definite answer that sweepstakes are illegal." (Pl.'s Opp'n, Ex. 8.) And, in an email about the basis for the subsequent denial of those applications, the Board's general counsel cited Sypolt's "involvement in illegal gambling (sweepstakes machines) and his undisclosed connection to the location(s)." (*Id.*) When the WCP Litigation came up in connection with the Board's consideration of Plaintiffs' own Establishment License applications, IGB agents simply noted Sypolt's affiliation with the lawsuit without further comment. (*E.g.*, DRPSAF ¶ 22 (discussing an email that placed a "red flag" on the applications because of Sypolt was "one of the owners of Windy City amusements (the plaintiff in the Grundy county case)").)

Most of the evidence discussed to this point reflects the views of the IGB and its staff generally. That evidence shows that any ill will amongst IGB staff toward Sypolt did not go beyond the antagonism arising from his distribution of what the Board deemed to be illegal sweepstakes machines. But the IGB is not a Defendant here. While the IGB as an entity might not have been motivated by the WCP Litigation to retaliate against Plaintiffs, Ostrowski, Hobgood, and Aguilar's respective motivations are what matter. As to their motivation, Plaintiffs offer Sypolt's testimony and affidavit in which he recounts statements that Hobgood made in 2019 in connection with his investigation of Trudy's Café's Establishment License applications.

Specifically, Sypolt claims that Hobgood told him that "Defendants planned on retaliating against Plaintiff Sypolt for the [WCP Litigation], because the case made Mark Ostrowski look like a paper tiger." (DRPSAF ¶ 17 (internal quotation marks omitted).) While Hobgood's statement tends to show retaliatory animus stemming from the WCP Litigation itself, the statement is admissible as a non-hearsay party-opponent statement only against Hobgood.[4] However, Plaintiffs do not assert a standalone First Amendment retaliation claim against Hobgood, they allege that Hobgood conspired with Ostrowski and Aguilar to retaliate against Plaintiffs for exercising their First Amendment rights.

To create a dispute of fact as to the existence of a conspiracy among Defendants, Plaintiffs' evidence must tend to show that the WCP Litigation was a shared motiving factor among all three conspirators. *E.g.*, *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 108 (7th Cir. 1991) (explaining that where a § 1983 conspiracy alleges that the plaintiff was retaliated against for his speech, "he must prove that each of the joint actors was in some part motivated by this unconstitutional purpose"). Put another way, there must be evidence tending to show that the three Defendants understood that they were treating Plaintiffs' Establishment License applications unfavorably not simply in accordance with the IGB's position on the sweepstakes machines' illegality but also because Sypolt challenged the IGB's position in court. *See Owens v. Evans*, 878 F.3d 559, 565 (7th Cir. 2017) (granting summary judgment on First Amendment retaliation and conspiracy claims where the plaintiff "provide[d] no basis on which to infer that the relevant officials were motivated by anything other than

[4] Defendants' objection to the admissibility Hobgood's own statement to Sypolt as a non-hearsay party-opponent statement is a non-starter. Their claim is that, because Hobgood passed away during the pendency of this action, he is a former party and a former party cannot be considered a party opponent. However, Hobgood's estate took his place as Defendant and Hobgood's statements can be admitted against his estate. *Todd v. City of Chicago*, 28 F. Supp. 2d 1062, 1064 n.2 (N.D. Ill. 1998).

following the law"). Hobgood's statement cannot be admitted as a non-hearsay coconspirator statement under Federal Rule of Evidence 801(d)(2)(E) to prove that Ostrowski and Aguilar agreed to cause constitutional harm to Plaintiffs because the Rule plainly states that a coconspirator statement, by itself, does not establish "the existence of the conspiracy or participation in it."

Other than Hobgood's statement, the record is devoid of evidence from which it can be reasonably inferred that the fact of the WCP Litigation motivated Ostrowski and Aguilar to retaliate against Plaintiffs. Insofar as Hobgood's statement evidences that the WCP Litigation was a factor motivating his own conduct, it does not, without more, suffice to establish the § 1983 conspiracy claim actually asserted. Summary judgment is therefore entered in favor of Defendants on the First Amendment conspiracy claim as well.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 274) is granted. The Clerk will enter Judgment in favor of Defendants.

ENTERED:

Dated: September 28, 2026

Andrea R. Wood
United States District Judge